Argued and submitted August 21, 2019, reversed and remanded
December 30, 2020, petition for review allowed May 20, 2021 (368 Or 168)
See later issue Oregon Reports

Richard Taylor WHITEHEAD;
Timothy Grant; and
Citizens in Charge Foundation,
a Virginia not-for-profit corporation,
*Plaintiffs-Appellants,*

*v.*

Bev CLARNO,
Secretary of State of the State of Oregon,
*Defendant-Respondent.*

Marion County Circuit Court
16CV28212; A167087

480 P3d 974

Plaintiffs brought this action under ORS 246.910 to obtain review of a decision by the Secretary of State, which disqualified Initiative Petition 50 (IP 50) from the 2016 ballot. The secretary determined that IP 50 lacked a sufficient number of valid signatures after subtracting the signatures of registered but "inactive" voters, whom she found were not "qualified voters" for the purposes of counting signatures on initiative petitions. Plaintiffs sought a declaration under ORS 28.010 that Article IV, section 1, of the Oregon Constitution grants both active and inactive registered voters the right to sign initiative petitions and have their signatures count toward the qualification of those initiatives. The secretary argued that voters with inactive registrations are not "entitled to vote" and are therefore not eligible to sign the petitions. The trial court denied summary judgment for plaintiffs and granted the secretary's motion for summary judgment. On appeal, plaintiffs argue that a "qualified voter" is entitled to sign initiative petitions under Article IV, section 1, if he or she meets the requirements of a "qualified elector" under Article II, section 2, of the Oregon Constitution. And, because a person may be a "qualified elector" without being actively registered to vote, that person is qualified to sign an initiative petition. *Held*: The trial court erred by granting the secretary's motion for summary judgment. The secretary's exclusion of signatures of registered but inactive voters deprives those voters of their constitutional right to participate in the initiative process. The Court of Appeals reversed and remanded the judgment for a declaration of rights consistent with its opinion.

Reversed and remanded.

J. Channing Bennett, Judge.

Gregory A. Chaimov argued the cause for appellants. Also on the briefs were Davis Wright Tremaine LLP and Eric C. Winters.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and Egan, Chief Judge, and Mooney, Judge.*

MOONEY, J.

Reversed and remanded.

DeHoog, P. J., dissenting.

_____
   * Egan, C. J., *vice* Hadlock, J. pro tempore.

**MOONEY, J.**

This case poses a question of first impression: Does a qualified voter under Article IV, section 1, of the Oregon Constitution lose the right to sign an initiative petition if his or her voter registration status is designated by the Secretary of State (secretary) to have become inactive? Plaintiffs filed an action in the trial court under ORS 246.910[1] to obtain review of a decision by the secretary that disqualified Initiative Petition 50 (IP 50) from the 2016 ballot and under ORS 28.010, seeking a declaration that Article IV, section 1, of the Oregon Constitution grants registered voters, active and inactive alike, the right to sign initiative petitions and have their signatures count. The court denied summary judgment to plaintiffs and granted summary judgment to the secretary. The secretary argued, and the court concluded, that voters with inactive registration status are not "entitled to vote" and, because of that, they are not eligible to sign initiative petitions. Therefore, according to the court, subtraction of those signatures from the petitions submitted in support of IP 50 was proper.

On appeal, plaintiffs assign error to the trial court's granting of summary judgment in favor of the secretary and to its denial of summary judgment in their favor. They argue that a "qualified voter" is entitled to sign initiative petitions under Article IV, section 1, if he or she meets the requirements of a "qualified elector" under Article II, section 2, of the Oregon Constitution. In other words, a United States citizen who has reached the age of majority, has resided in Oregon for the requisite amount of time, and who is registered to vote under Oregon law is qualified to sign an initiative petition. Plaintiffs contend that the secretary may not reject the signatures of registered voters whom she has designated "inactive." As we explain below, we conclude that the

---

[1] ORS 246.910(1) provides that

"[a] person adversely affected by any act or failure to act by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law, or by any order, rule, directive or instruction made by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law, may appeal therefrom to the circuit court for the county in which the act or failure to act occurred or in which the order, rule, directive or instruction was made."

trial court erred as a matter of law because the secretary's exclusion of signatures made by registered but inactive voters unconstitutionally deprives those registered voters of their right to participate in the initiative process—a right reserved to the people. We, therefore, reverse and remand for a declaration of rights consistent with this opinion.

The material facts are not in dispute. Plaintiff Whitehead, chief petitioner of IP 50, gathered signatures and submitted them to the secretary for verification and placement on the ballot. Plaintiff Grant's signature was among those submitted. Plaintiff Grant's voter registration had been designated "inactive" after he temporarily relocated out of state to be with his spouse who was serving in the United States Armed Forces. When the secretary subtracted the number of signatures made by inactive voters from the total number of signatures made by otherwise qualified voters, IP 50 did not qualify for the ballot.

In an appeal arising from cross-motions for summary judgment, the granting of one and the denial of the other are both reviewable. *Arrowood Indemnity Co. v. Fasching*, 304 Or App 749, 751, 469 P3d 271, *rev allowed*, 367 Or 290 (2020). Where, as here, the material facts are not in dispute, the only question is whether either party is entitled to judgment as a matter of law. We thus review for legal error. *Bergeron v. Aero Sales, Inc.*, 205 Or App 257, 261, 134 P3d 964, *rev den*, 341 Or 548 (2006). In doing so, we are guided by state policy that "election laws and procedures shall be established and construed to assist the elector in the exercise of the right of franchise." ORS 247.005.

Oregon's initiative and referendum process goes back to the beginning of the twentieth century when, in 1902, Oregon voters overwhelmingly approved a legislatively referred ballot measure that created that process. The system of empowering people to propose new laws or to change the Oregon Constitution became nationally known as "direct democracy" and was commonly referred to as "the Oregon System." *Oregon Blue Book*, Initiative, Referendum and Recall Introduction, 2020; David Schuman, *The Origin of State Constitutional Direct Democracy: William Simon U'Ren and "The Oregon System,"* 67 Temple L Rev 947, 948

n 7 (1994). The initiative process is deeply ingrained in Oregon's history and culture, and it remains firmly rooted in the Oregon Constitution.

Article IV, section 1, vests the legislative power of the state in the legislative assembly "except for the initiative and referendum powers reserved to the people." And, in Article IV, section 1(2)(a), "[t]he people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly." Article IV, sections 1(2)(b) and (c) provide for the proposal of initiatives by petition signed by a number of "qualified voters" equal to 6 percent (for laws) or 8 percent (for constitutional amendments) of votes cast at certain preceding gubernatorial elections.

The term "qualified voters" is not defined in the constitution, but the Supreme Court has said "qualified voters"—those entitled to sign initiative petitions—must meet the Article II, section 2, requirements for "qualified electors." *State ex rel Sajo v. Paulus*, 297 Or 646, 653-54, 688 P2d 367 (1984).[2] Article II, section 2, currently provides:

"Qualifications of electors. (1) Every citizen of the United States is entitled to vote in all elections not otherwise provided for by this Constitution if such citizen:

"(a) Is 18 years of age or older;

"(b) Has resided in this state during the six months immediately preceding the election, except that provision may be made by law to permit a person who has resided in this state less than 30 days immediately preceding the election, but who is otherwise qualified under this subsection, to vote in the election for candidates for nomination or election for President or Vice President of the United States or elector of President and Vice President of the United States; and

"(c) Is registered not less than 20 calendar days immediately preceding any election in the manner provided by law.

---

[2] At the time *Sajo* was decided, Article II, section 2(1)(c), did not include the language requiring registration be completed "not less than 20 calendar days" immediately prior to an election. That change in language does not materially impact this decision.

"(2) Provision may be made by law to require that persons who vote upon questions of levying special taxes or issuing public bonds shall be taxpayers."

Thus, United States citizens who meet the age and residency requirements and who are registered to vote under Oregon law are "qualified electors" who (1) may vote in an election and (2) may sign initiative or referendum petitions. While the basic qualifying criteria to exercise each right of the franchise are the same, the franchise consists of two independent rights—the right to join with others to bring matters before the voters and the right to cast a vote on any matter that is before the voters.[3]

The Supreme Court has said that, in order to be eligible to vote on election day, "Article II, section 2, neither requires nor defines registration of otherwise 'qualified voters[.]'" *Sajo*, 297 Or at 654. Nevertheless, Article II, section 2, contemplates that the legislature will provide the method by which voter registration is accomplished ("in the manner provided by law") and the legislature has, in turn, created a comprehensive voter registration process in ORS chapter 247.

ORS 247.012(3) sets forth the manner by which a person may register to vote, and ORS 247.012(8) states that, once a registration card is received and accepted, it "shall be considered an active registration." So long as the county clerk "does not have evidence of a change in any information required for registration," the elector's registration "shall be considered active."[4] ORS 247.013(5).

---

[3] Our review concerns the right to sign initiative petitions. The parties do not challenge, and we do not decide, the constitutionality of ORS 247.013(7), which requires an inactive registrant to update his or her registration before casting a ballot in an election.

[4] The legislature introduced the concept of active and inactive registration in 1993 in order to comply with the National Voter Registration Act (NVRA), 55 USC §§ 20501 to 20511. *See* Staff Measure Summary, Majority Report, House Committee on General Government, HB 2280-A (June 24, 1993). The NVRA effectively required states to maintain a system for removing ineligible voters for federal offices but limited the ability of states to cancel voter registrations. *See Husted v. A. Philip Randolph Inst.*, ___ US ___, 138 S Ct 1833, 1838-40, 201 L Ed 2d 141 (2018) (describing the NVRA). To avoid confusion, Oregon created uniform rules for state and federal voter registration and maintains a single registration system.

A registration is deemed "inactive" where the count clerk receives evidence that there has been such a change and, in compliance with ORS 247.563, mails notice to the elector of the need to update his or her registration. The registration remains inactive "until the elector updates the information" or "the registration is canceled." ORS 247.563(3). The registration will be canceled if the elector "neither votes nor updates the registration before two general elections have been held." ORS 247.563(2)(c). An elector's registration "shall not be considered inactive" until "[t]he voter has neither voted nor updated their registration for a period of ten years[,]" and notice pursuant to ORS 247.563 has been sent. OAR 165-005-0180.

To vote in any given election, an elector's registration card must be received, postmarked, or electronically delivered—depending on the selected transmittal method—at least 20 days before the election. ORS 247.025. Any "inactive" registration must be updated, ORS 247.013(7),[5] at any time up to 8:00 p.m. on election day, ORS 247.303.

Article IV, section 1(2), provides that "qualified voters" may sign initiative petitions." The Supreme Court has said that "qualified voters" must meet the criteria of "qualified electors" under Article II, section 2. ORS 250.025(1) provides that "[a]*ny elector* may sign an initiative or referendum petition for any measure on which the *elector is entitled to vote*." (Emphases added.) ORS chapter 250, concerning the initiative and referendum process, does not refer to active or inactive registration. The only statutory reference that directly addresses the impact of inactive registration status is ORS 247.013(7), which requires inactive registrations to be updated "before the elector may vote in an election." The prefiling verification procedure for petition signatures requires a mechanism for verification and Article IV, section 1(4)(a), requires the legislature to provide "the manner in which" the secretary will verify those signatures. It has done that with ORS 250.105 in which the word "registration" appears only once and then only

---

[5] ORS 247.013 was amended in 2019, resulting in renumbering subsection 8 as subsection 7. Or Laws 2019, ch 675, § 1. All references in this opinion are to the current statutory provision, ORS 247.013(7).

to define one possible place for the secretary to identify that an elector signed a specific initiative or referendum petition. Nevertheless, the secretary has included instruction in the State Initiative and Referendum Manual that "each petition signer *** be an active registered voter at the time of signing the petition." Elections Division, Oregon Secretary of State, *State Initiative & Referendum Manual*, 25 (2020), available at https://sos.oregon.gov/elections/documents/stateir.pdf (accessed Dec 17, 2020).

Plaintiffs argue that rejecting the signatures of voters with inactive registration status impermissibly narrows the class of voters who may sign petitions as "qualified voters" under Article IV, section 1(2)(c), by treating registered voters deemed "inactive" as if they were not registered. The secretary responds that a person may sign a petition if that person is "entitled to vote," which, in turn, requires that the person meet the requirements of Article II, section 2, including the registration requirement. She reasons that, because an elector must update the elector's registration before voting in an election, ORS 247.013(7), that elector is not "entitled to vote" until the elector has completed the update. The secretary argues that the "key moment for eligibility is the moment of signing" the petition, and that the signatures of registered voters whose registration status is "inactive" when they sign are not valid because the signer is not "entitled to vote" at that moment. Plaintiffs and the secretary rely upon *Sajo* in support of their respective arguments, necessarily drawing different conclusions from that case.

The trial court concluded that

"[t]he inactive voter statute is clearly within the legislative authority granted by the Constitution. *** Under ORS 247.013(8), an inactive registration of an elector must be updated before the elector will be eligible to vote in an election. An elector, who has been determined to be inactive must update his/her registration in order to be eligible to vote.

"The requirement that electors must be eligible to vote at the time they sign initiative petitions is long and well established. [*See*] *Sajo*, 297 Or [at] 660. The fact that the legislature enacted the inactive vote statute after *Sajo* does not change the analysis."

The court granted summary judgment to the secretary, finding that the signatures of registered but inactive voters were properly excluded in the signature verification process. Therefore, the legal question before us is whether registered voters with inactive registration status may sign initiative petitions as qualified electors and whether the court erred in concluding that the secretary was entitled to judgment as a matter of law.

*Sajo* was an original mandamus proceeding concerning the post-filing procedure for verifying signatures submitted in support of a marijuana initiative. *Sajo*, 297 Or at 648. The petitioners alleged that the secretary and 28 county clerks failed to follow proper signature verification procedures that, in turn, led to the improper disqualification of a number of petition signers and the refusal to place the initiative on the ballot. *Id.* In particular, the *Sajo* petitioners challenged six categories of signatures that the secretary had ruled invalid. *Id.* The Supreme Court concluded that improper legal standards were applied in five of those categories and issued an alternative writ ordering the defendants to recount and verify the signatures. *Id.* at 661.

The significance of *Sajo* for our purposes is most particularly in the court's discussion of the sixth category of signatures by persons who, at the time of signing the petitions, were not registered to vote.[6] The court explained that ORS 250.025 and Article IV, section 1(2)(b), "contemplate that petition signers will be qualified voters at the time they sign the petition." *Id.* at 660. It went on to state

---

[6] *Sajo* also concerned the disqualification of signers who signed petitions in counties other than where they resided; where there were variances between the address placed on the petition and that on the signer's voter registration card; signers who changed their names between the time of signing and verification; and persons who were registered to vote at the time they signed the petition but whose names had subsequently been removed "from the active voter file." 297 Or at 655-59. The court directed the secretary to recount and verify those signatures. As to those signers whose names had been purged from the "active voter file," the Supreme Court rejected the secretary's argument that the work involved in determining the timing of removal would unduly delay the verification process, noting that the constitutional and statutory requirements could not "be avoided for the sake of speed and efficiency." *Id.* at 659. As discussed below, given that *Sajo* was decided almost 10 years before the legislature added the statutory requirement that inactive registrations be updated prior to voting, we attach no particular significance to the court's reference to "active voter file[s]."

that "eligibility to vote is a requirement that must exist at the time a voter signs a petition." *Id*. Noting that a voter is not registered until that voter's registration card is received and accepted by the county clerk, the court held that it was not legal error to disqualify the signatures of persons whose registration cards were filled out, but not yet received, at the time they signed the petition. *Id*.

The secretary argues that, like the "qualified but not-yet-registered voters in *Sajo*, inactive voters must complete some additional act to be entitled to vote on Election Day. Until they complete that act, they are not entitled to vote and, under ORS 250.025(1), may not sign initiative petitions."[7] Plaintiffs argue that applying *Sajo* to render registered voters who must update their registration information before voting ineligible to sign initiative petitions is wrong because all registered voters are entitled to vote under Article II, section 2(1). They argue that the people did not authorize the legislature to create different categories of registered voters—some who may sign petitions and some who may not.

We do not read *Sajo* to hold that voters who must update their registration information before voting may not sign initiative petitions. The *Sajo* court concluded that the signatures of those signers who were registered at the time they signed the petition but whose names were later removed from the "active voter files should not have been invalidated for that reason." 297 Or App at 659. It referred to this category of signatures as "[p]urged [r]egistrations" and required the secretary to determine when the signers' names had been purged. *Id*. If purged before the voter signed the petition, then the signature would not be counted. If purged after the voter signed the petition, then the signature would be counted. Because the concepts of active and inactive registration were not a part of Oregon's election

---

[7] The secretary's argument that an elector with inactive registration status is not entitled to vote until his or her registration is updated, and therefore may not sign an initiative petition until then, misses the point. As we explain, the secretary's registration system assigns inactive registration status as a step in the process of maintaining current voter lists that may or may not lead to removal (purging) from the list. But, until an elector is no longer registered, the elector is registered.

laws until 1993, nearly 10 years after *Sajo* was decided, we do not understand the court's use of the phrase "active voter files" to reflect anything other than the files of registered (nonpurged) voters. The relevant distinction in *Sajo* was between purged and nonpurged registrations. That distinction is not at issue in the case before us. Petitioners do not argue, and we do not hold, that voters whose registrations have been canceled and whose names have been purged from the voter lists are entitled to sign initiative petitions.

Plaintiffs do not argue that the secretary's process for removing voter names and otherwise maintaining the state's voter registration lists is improper or flawed. Plaintiffs do not assert that the state improperly designated the invalidated signers as inactive. The question instead is whether a registered voter whose registration is designated inactive is still a qualified elector under Article II, section 2, and, therefore, a voter who may sign an initiative petition. Unlike those petitioners in *Sajo* whose registration cards had not been received by the state at the time they signed the petition, the state here had received and accepted the registration cards of the signers. The requirement that they update their registration information before voting did not cancel the signers' registrations and it did not otherwise render them not registered. Article II, section 2(1)(c), requires that the person be "registered." Characterizing registration status as active or inactive is an administrative requirement undertaken by the secretary as part of the process of maintaining current voter lists. It is a step taken that may—or may not—eventually lead to cancelation of registration, but it is not the same as cancelation. In *Sajo*, the sixth category of signers were not yet registered when they signed the petition and, here, the signers were registered when they signed the petition. Those are very different circumstances.[8] Plaintiffs' registration cards were received and on file and, because of that, the secretary was able to verify the signatures. That is different than persons for whom registration cards have not yet been received, making verification

---

[8] Plaintiffs note that *Sajo* was decided almost 10 years before the legislature added the statutory requirement that inactive registrations be updated prior to voting. But, for our purposes, the timing is not critically important. *Sajo* is instructive because of the facts that distinguish it from the case before us.

impossible. It is also different than voters whose registration cards have been purged from the voter files.

The secretary argues that use of the phrase "[r]egistered * * * in the manner provided by law[]" in Article II, section 2(1)(c), should be read broadly as granting the legislature authority not only to "determine the 'how'" but also to "determine the 'what'" of the voter registration requirement. That is to say, the secretary may determine both the process for registration and what registration means. In support of that argument, she relies on *State ex rel. v. Clark*, 143 Or 482, 22 P2d 900 (1933), which held that the signatures of voters removed from the register of electors should not count on a petition to recall the then-mayor of Baker City. *Clark* concerned Article II, section 18, of the Oregon Constitution, which provided that every public officer was subject to "recall by the legal voters" of the "electoral district from which he is elected."[9] 143 Or at 485. At that time, voters who did not vote in any given biennium had their names removed from the register of electors. Unless the voter appeared at the county clerk's office to sign a statement confirming the accuracy of the voter registration information, their names were not put back on the register of electors. Notice was not required. Setting aside the fact that the statutory provisions at issue in *Clark* have been repealed, we note first that the secretary does not argue that failure to vote alone would withstand constitutional scrutiny today as grounds for cancelation of one's voter registration. We understand her reliance on *Clark* to be solely for the proposition that the term "registration" includes the obligation to register and also to "maintain" that registration. She thus argues that the phrase "registered * * * in the manner provided by law" contemplates both initial registration and registration maintenance. But the question before us is not whether it was proper for the secretary to exclude the signatures of persons whose names had been removed from the list of registered voters. The question is whether registered and otherwise qualified voters who have been assigned the status of inactive *but whose registration has not been*

---

[9] The current text of Article II, section 18, uses the term "electors" rather than "legal voters."

*canceled* are nonetheless "registered" as provided by law. We determine that the answer to that question is yes.

An elector may sign an initiative petition if that elector meets the requirements of Article II, section 2: United States citizenship, age, Oregon residency, and voter registration as provided by law. While the statutes regulating voter registration indeed distinguish between "active" and "inactive" registration, that distinction does not compel the conclusion that a voter whose registration is inactive is not registered. In *Clark*, by contrast, the voters were removed from the register of electors, rendering them no longer registered. Neither the legislature nor the secretary is constitutionally authorized to create classes of registration that effectively disenfranchise registered voters. The franchise includes both the right to vote and the right to sign initiative and referendum petitions. Election procedures should not create substantive barriers to the exercise of the franchise, and they should not discourage private citizens from participating in governance and carrying out their civic right—and duty—to do so. Instead, election procedures should encourage citizens to exercise their constitutional right to participate in the democratic process so that the will of the people can be determined.

We conclude that the secretary's exclusion of signatures made by registered but inactive voters unconstitutionally deprived those electors of their right to participate in the initiative process. The trial court erred when it granted summary judgment to the secretary and denied summary judgment to plaintiffs.

Reversed and remanded.

**DeHOOG, P. J.,** dissenting.

I strongly agree with the principles that the majority opinion articulates, including its observations that the right to sign initiative and referendum petitions, like the right to vote, is critical to our democracy and that the exercise of that right should be encouraged, not substantively impaired. 308 Or App at 280. I do not agree, however, that the Secretary of State's understanding and application of the statutory and regulatory framework governing that

exercise substantively impairs that right. Notably, the process for deeming an otherwise lawfully registered voter "inactive" requires both (1) statutorily compliant notice to the voter by forwardable mail and (2) that the voter has neither voted nor updated the voter's registration for a period of 10 years. ORS 247.563(3) (requirements of notice); ORS 247.013(6) (permitting inactive designation only if notice satisfying ORS 247.563(3) has been mailed to voter); OAR 165-005-0180 (prohibiting inactive designation unless voter has not voted or updated registration for 10 years). And, in this case, no plaintiff contends that the secretary did not comply with any aspect of that process.

In my view, the majority opinion bases its conclusion—that, notwithstanding the secretary's compliance with those provisions, she violated the constitution—on an erroneous understanding of the applicable constitutional provisions and the statutes implementing them. In that regard, my view largely tracks the arguments that the secretary advances on appeal and that the trial court relied on in its own decision. Without belaboring the matter, I will observe that, as I read the Supreme Court's opinion in *State ex rel Sajo v. Paulus*, 297 Or 646, 653-54, 688 P2d 367 (1984), that decision established only a necessary, but not invariably sufficient, requirement for a person to be a "qualified voter" entitled to sign a petition under Article IV, section 1(2), of the Oregon Constitution. I further believe that, given the majority opinion's analysis in this case, it inescapably follows that ORS 247.013(7)—which prohibits inactive registrants from voting without updating their registrations—is unconstitutional, and that a footnote disavowing any decision regarding that statute cannot avoid that conclusion. *See* 308 Or App at 273 n 3. Accordingly, I respectfully dissent.